MINOT SAND AND GRAVEL COMPA-
NY, a corporation, Plaintiff-Appellant,

v.

Walter R. HJELLE, Highway Commission-
er of the State of North Dakota, and
State of North Dakota, Defendants-Ap-
pellees.

No. 9062.

Supreme Court of North Dakota.

July, 9, 1975.

Bosard, McCutcheon, Kerian, Schmidt & Holum by E. Hugh McCutcheon, Minot, for plaintiff-appellant.

Norbert H. Lange, Sp. Asst. Atty. Gen., State Highway Dept., Bismarck, for defendants-appellees.

SAND, Judge.

The landowner appealed to this court from a Ward County district court judgment[1] in a condemnation action and from denial of motion for a new trial.

The appellant landowner, Minot Sand and Gravel ·Company [hereinafter landowner], owns and works large open gravel pits located just west of the city limits of Minot, North Dakota. The landowner has been extracting commercially saleable sand, rock, and gravel [hereinafter aggregate] by the open pit method from the land on which the pits are located since 1927. The land on which the gravel pit operations conducted by the landowner take place is straddled by a north-south section line upon which a two-lane county road existed prior to the date of this action.

In April 1973, the appellees, Walter R. Hjelle, the State Highway Commissioner of the State of North Dakota, and the State of North Dakota [hereinafter both appellees will be referred to when the term "State" is used] filed with the clerk of the Ward County district court an offer to purchase certain portions of the land upon which the landowner had his gravel pit operation, pursuant to the "quick take" procedure authorized by Section 14 of the North Dakota Constitution and related statutes. Concomitant with the filing of the offer to purchase, the State also deposited the sum of $23,840 with the clerk of said court.

The landowner, pursuant to Section 24–01–22.1, North Dakota Century Code, timely appealed the notice of taking, and the matter was tried to a Ward County jury on November 19, 1974, which jury awarded the landowner the sum of $50,120.00 for the taking. The landowner moved for a new trial, which was denied, whereupon this appeal followed.

The trial judge, in what may be considered a case of first impression in this State (the parties treated it as such), had a novel, complex situation with only limited or sketchy precedent available to him.

The need for, or the utilization of, modified or new factors, in determining the value of property in eminent domain or con-

---

1. An amended judgment was also filed pursuant to stipulation containing the appel-
lant's attorney's fees and costs. This appeal is also from that amended judgment.

demnation proceedings within the willing buyer and willing seller formula, correspondingly increases with the varied or new uses made of property. This is particularly true where the use involves the removal or extraction for use or sale of a portion of the land itself.

The landowner has raised a great number of issues for our review on this appeal, but (due to our ultimate disposition of this appeal) it is not necessary that we separately consider each of those issues.[2] Some of those issues can be consolidated and some are not relevant to our decision in this case.

We now address ourselves to the issue whether or not the State acquired a fee simple of the property lying within the section line easement.

In the instant case the State, pursuant to the provisions of Section 14 of the North Dakota Constitution, and related statutes, has taken, through the exercise of its power of eminent domain, a fee simple title to landowner's property abutting and adjacent to the section line easement in question for a distance of approximately one-quarter mile along the east side of the section line and approximately one-half mile along the west side of the section line. (Exact figures on distance, etc., are not significant here to resolve the issues involved.) The property taken was described by metes and bounds.

The landowner contends that the State, as the new owner or substituted fee owner of the abutting and adjacent property, by operation of law, became the fee owner of the property within the section line easement to the center of the section line at any point where the taken property abutted the section line. The landowner also argues strenuously that the State has taken, without due process of law guaranteed by Section 22 of the North Dakota Constitution and without just compensation, the landowner's fee interest in hundreds of thou-

sands of tons of commercially valuable aggregate underlying the section line easement contiguous and adjacent to the landowner's condemned abutting property.

The extent and nature of ownership of section line highways was set forth by this court in *Lalim v. Williams County*, 105 N.W.2d 339, 343 (N.D.1960), when we said:

> " ' * * * there can be no question but that no proceedings are necessary to establish a highway on a section line. In other words, we believe that the territorial Legislature (Chapter 33 Laws Dakota Territory 1871) by accepting the federal grant (U.S.Rev.St. § 2477; Comp.St. § 4919) established a system of highways upon all the section lines in the state, as far as it is practicable to use them for highway purposes.' *Huffman v. Board of Supervisors, West Bay Township, Benson County*, 47 N.D. 217, 182 N.W. 459, 461.

"The legislature has declared that outside of the limits of incorporated cities and villages congressional section lines shall be considered public roads to be open to the width of two rods on each side of such lines. Section 24–0703, NDRC 1943. It is clear that at the time the deed was given a public highway already existed along and for two rods on each side of the section lines. The right of the public was in the nature of an easement for a right of way which was first vested in the Territory of Dakota and later in its successor, the State of North Dakota, and held in trust for the benefit of the public. 25 Am.Jur., Highways, Secs. 133, 134; 39 C.J.S. Highways § 136. *The adjacent landowner continued to be the owner of the fee subject to the easement on behalf of the public. Rutten v. Wood*, 79 N.D. 436, 57 N.W.2d 112; *Wallentinson v. Williams County*, N.D., 101 N.W.2d 571." [Emphasis supplied.]

---

**2.** Thus, issues such as whether the jury verdict was based on speculation and conjecture; whether the verdict was against the

evidence; whether the jury improperly arrived at a verdict, etc., are without the ambit of our consideration *infra*.

Most recently, this court, as to the fee ownership of section lines, said in *Small v. Burleigh County*, 225 N.W.2d 295, 297 (N.D. 1974):

> "In North Dakota the rights of the public to section line highways and to streets are easements only, limited to the right to travel and other rights incident thereto, and the owner of the adjoining land owns the fee title to the property included in the 33 foot easement up to the section line. *Northern Pacific Railway Company v. Lake, supra*, [10 N.D. 541, 88 N.W. 461]; *Donovan v. Allert*, 11 N.D. 289, 91 N.W. 441 (1902)."

■ From the foregoing it can be readily observed that under existing law the abutting landowner in the instant case owned the property in fee simple up to the middle of the section line subject to the public's easement. It is the landowner's contention that where the State became the abutting landowner the State became the owner in fee simple also of the land up to the middle of the section line. However, in this instance we have a situation which is entitled to special consideration. The State in its condemnation proceedings described the property to be taken from the landowner by metes and bounds rather than by a general description, such as the East Half of the East Half, or the West Half of the Northwest Quarter, or some other similar type description. We have found very little case law touching upon this specific subject under similar circumstances.

A United States District Court, applying California law, in *United States v. 5.324 Acres of Land*, 79 F.Supp. 748 (S.D.Cal. 1948), held that the metes and bounds description used in condemning abutting property did not include the fee to the center of adjoining streets, even in the face of a presumption that, under such facts, the land to the center of adjoining streets is included by use of such description, because such presumption would be rebutted by a showing as to the intent of the parties concurrent with the application of the general rule that property rights taken by the exercise of the power of eminent domain should be strictly construed. In this case the State expressed no intent of taking to the middle of the section line, but rather said in oral argument it did not intend to take to the middle of the section line.

■ Also, in *Wallentinson v. Williams County*, 101 N.W.2d 571, 575 (N.D.1960), this court was constrained to say the following concerning the statutes limiting the exercise of the eminent domain powers:

> "Generally, the nature or extent of a title or rights taken in the exercise of eminent domain depends on the statute conferring that power. Such statute will be strictly construed where the estate or interest to be taken is not definitely set forth, only such estate or interest may be taken as is reasonably necessary to carry out a public purpose for which the land is being taken. 30 C.J.S. Eminent Domain § 449, p. 195."

However, the Minnesota Supreme Court in *State v. North Star Concrete Company*, 265 Minn. 483, 122 N.W.2d 118, 121–122 (1963), said:

> "By implication [from relevant Minnesota statutes re eminent domain], it seems obvious that the [highway] commissioner is not authorized to take a greater estate than is needed, nor permitted to take less than what in fact will be used consistent with the purposes for which the land is taken. Since the extent of the estate taken directly affects the amount of the compensation required to be paid, this limitation on his authority finds its most persuasive support in the constitutional guarantee that private property shall not be taken 'without just compensation therefor, first paid or secured.' If the estate taken is designated as an easement but the facts establish that the use thereof will deprive the owner of all practical beneficial use of the servient fee, that constitutional provision would require that the owner be permitted to calculate his damages on the basis

that the fee was taken. It is well established that whether proper compensation has been made is a judicial question, the final determination of which rests with the court. Where the taking deprives the owner of all practical beneficial use, requiring compensation to be measured as if a fee were taken is not compelling the [highway] commissioner to take the fee but rather is enforcing the constitutional right of the owner to just compensation. In this sense the commissioner's determination to take less than the fee is not binding on either the owner or the court. The final determination of the extent of the taking or of the estate acquired is a question of fact. Where the facts are disputed on the issue of whether any practical beneficial use remains in the owner, a jury issue arises; where there is no dispute, the issue is for the court."

In the Minnesota case, the landowner had a permit to mine gravel from the bed of a river. The State Highway Commissioner sought to facilitate highway improvements by condemning approximately ten acres of the landowner's land in order to relocate the bed of the river so that it lay on six acres of the condemnee's land. The Commissioner, in furthering this purpose, condemned only for the purpose of taking an easement, and the trial judge instructed the jury in such a way as to allow them to speculate as to whether the landowner might be able to get a permit for further mining of gravel under the now-relocated river bed.

The Minnesota Supreme Court held that since the law rendered the State of Minnesota the fee owner of all navigable river beds, the jury should not have been allowed to speculate to the prejudice of the landowner.

In the Minnesota case, the appellate court stated that, the facts being what they were, the trial court should have instructed the jury that a fee was being taken in the land rather than the mere easement, as alleged by the State.

The Minnesota case involved an additional factor, namely, state ownership of all navigable river beds (which is also true in North Dakota). The instant case, however, does not involve a navigable stream law situation, nor do we have similar statutes applicable to those facts, and, as such, the Minnesota case is not persuasive on this point even though its rationale as to damages is applicable, as will be discussed infra.

■ Because the State of North Dakota, in taking the abutting property, described what it was taking by metes and bounds, we conclude that the State did not become the fee simple owner of the section line easement but acquired a fee simple only of the abutting and adjacent land described in the instrument.

■ Nevertheless, the State, by taking the abutting and adjacent land, may have deprived the owner of many, if not all, benefits and uses of the property in the section line easement, particularly as to the aggregate lying beneath the section line easement. The extent of such damages is a question of fact to be decided by the trier of facts. Conceivably, the damages sustained by the landowner could be the equivalent of the State taking a fee simple of the section line easement. The damages sustained would be determined upon the evidence submitted.

■ The landowner, at the time of the trial, made two somewhat similar offers of proof in chambers, outside of the hearing of the jury, to the effect that, according to test borings, approximately 403,000 tons of commercially valuable aggregate underlay the section line easement abutting the property which is the subject of this action. These offers of proof were necessitated after the trial judge ruled that such evidence was not admissible to establish damages or to establish enhancement of the market value of the abutting property for the reason that the landowner had failed to show a feasible method for extracting such aggregate, in light of the fact that said deposits

were topped by a two-lane county highway along the section line, and that the existence of said highway carried with it the imperative right of the State (as congressional grantee) to subjacent and lateral support.[3]

If the land (the section line easement) in question contained gold or other valuable minerals there would be little or no doubt that feasible methods could be developed to extract the gold or other valuable minerals. However, in this instance, because the material (aggregate) has a lesser value, it in reality makes the removal or extraction issue primarily one of economic feasibility, even though some questions of law are involved.

Section 14 of the North Dakota Constitution provides, in pertinent part, as follows:

"Private property shall not be taken or damaged for public use without just compensation having been first made to, or paid into court for the owner."

2A Nichols on Eminent Domain § 6.444 (3d ed. 1974) states:

"In addition, there are appurtenant to land abutting upon a public way certain rights in the way which are peculiar to such land and which the owner of the land is entitled to enjoy in connection with his property until he is disturbed by the paramount power of the state, and which unquestionably gives such land an additional value. In some jurisdictions such rights are considered property in the constitutional sense, and they cannot be destroyed, even by express authority from the legislature, without compensation. While this view of the nature of such rights is not universally accepted, it is everywhere conceded that, as a matter of interpretation, when it is expressly provided by law that damage to land from public improvements shall be paid for, destruction of an abutter's peculiar

rights in a public way comes within the scope of such provision."

While the section quoted above, as shown by its context, deals with such matters as an abutting owner's right to access, right to a relatively unobstructed way, etc., we do not believe that it would be inapplicable in the instant case merely because we are dealing here with somewhat more quantifiable rights in an adjoining highway rather than with incorporeal property rights resultant from the fact that real property is adjacent to a public way.

In a note entitled *Public Needs and Private Rights: Eminent Domain and Land Condemnation in North Dakota*, 38 N.D.L. Rev. 36, 46, the authors,[4] in their overview of the North Dakota law regarding eminent domain, make the following observations regarding the rights of abutting owners:

"Although very little case law exists regarding this problem, it is generally conceded that, as a matter of interpretation, when it is expressly provided by law that damage to land from public improvements shall be paid for, the destruction of an abutter's peculiar rights in a public way comes within the scope of such provision. Where access of abutting lands is obstructed in North Dakota by a change of grade on the road, the owner is entitled to compensation under the 'damage' provision of the [North Dakota] Constitution. *Cummings v. Minot*, 67 N.D. 214, 271 N.W. 421 (1931)."

This court's most recent case in which we alluded to the rights of an abutting owner (in reference to the right of ingress and egress onto an abutting public way) was *Guerard v. State*, 220 N.W.2d 525 (N.D. 1974). In that inverse condemnation case the plaintiff's property did not abut on the highway, but, rather abutted on a city street, which city street was closed off by highway improvements which rendered it a

---

**3.** See *e. g.* Sections 24–12–01, 24–12–02, N.D.C.C., which proscribe the injuring or damaging of public highways.

**4.** James P. White and James D. Schlosser.

cul-de-sac where it formerly entered the improved highway.

We held in that case that the plaintiff who resided within one city block of the cul-de-sac was entitled to damages for diminution in the market value of his property due to loss of ingress and egress, provided such damages were legally provable and were without the ambit of *damnum absque injuria*.[5]

The landowner in the instant case should have been permitted to introduce evidence before the jury as to the value of the aggregate underlying the section line easement. The landowner was engaged in the sand and gravel business. The widening of the highway, resulting in the taking of the abutting property, could substantially reduce the probabilities of reverter,[6] and could also substantially reduce the capabilities of extracting such aggregate. All of this is the direct result of the State's activities relating to the widening of the road. These are all questions of fact which need to be resolved by the trier of facts, based upon competent evidence. The just compensation to which the landowner is entitled is as of the date of the taking.

We therefore hold that the court erred in not permitting the landowner to introduce evidence as to the amount and value of the aggregate lying within and under the section line easement. However, any testimony as to the value of the aggregate lying within and under the section line must be measured or considered with other evidence relating to the cost of extracting such aggregate at the time of the taking by the "quick take" procedure. Such evidence would, out of necessity, also relate to the possibility of reverting the use of the right of way easement to the landowner.

There are other interesting factors which may also become significant in the event of a retrial of this case. Generally, the State has the right to take only such soil and other materials found within the lines of a highway, the fee of which is in the abutting owner, for the on-site construction or repair of highways. The taking of such material from a public easement justifies using only that material as the process of construction or repair of the way requires and necessarily compels to be removed. See 39 Am.Jur.2d *Highways, Streets, and Bridges* § 164, page 540. The same authority, in § 165, page 541, also states that "mines or quarries may be worked and the minerals removed, provided the work can be and is done in such manner as not to injure the highway or interfere with the public use and enjoyment thereof." These principles would have application here. There is, however, a further factor to be considered. If the State pays damages for the aggregate lying within and under the easement the restrictions stated above would not apply. The State would have satisfied the constitutional requirement of paying just compensation. We would, therefore, conclude that if the State pays just compensation for the aggregate, the State could use the aggregate at any place it deemed appropriate. It would also follow that if the State is aware that it must pay

---

5. A perusal of that case will reveal that the concept of *damnum absque injuria* as it applies in questions regarding a property owner's right to access to a public way can become somewhat complex and difficult to resolve, *e. g.*, circuity of travel which generally is not compensable.

6. See Section 24–01–28, N.D.C.C., providing that the Highway Commissioner may vacate any land taken for highway purposes, thus revesting title in the persons (or their successors) from whom it was originally taken. *See also, Wallentinson v. Williams County*, 101 N.W.2d 571 (N.D.1960), where this court noted that such vacation could only occur when the subject land was no longer needed for the purposes for which it was taken. In *Wallentinson*, a quiet title action, we also expressed the opinion (and such is *obiter dictum*) that the trier of fact in the prior condemnation action dealing with the subject property presumably took into account the possibility of reverter and awarded less for the taking than would have otherwise been awarded if the possibility of reverter pursuant to statute had not been available.

for the aggregate it may employ procedures in the construction and reconstruction so as to permit the extraction of the aggregate and use it at other places. In any event, if the aggregate is valued in place the cost of removing would still constitute a factor.

Because of our ultimate disposition of this appeal, we must of necessity take up the question raised by the landowner as to the competency of testimony of the State's valuation expert based upon comparable sales, even though our discussion of this matter will have the sole effect of being helpful to the trial court in the event of a retrial of this case.

In the article entitled *Observations on the Trial of Eminent Domain Cases*, reprinted in The Practical Lawyer's Real Property Law Manual No. 1 (The American Law Institute, 1974), beginning at page 165, the author[7] notes that opposing valuation experts in eminent domain proceedings must testify as to the market value of the subject real property and that:

"In the case of minerals, gravel, and the like, the market value is the value of the land with the minerals in place, which is usually much less than the value of the land plus the value of minerals removed, less the expense of removing. Any testimony as to the latter is likely to be stricken as not being based upon the proper measure of damages. *United States v. Sowards*, 370 F.2d 87 (10th Cir. 1966)." The Practical Lawyer's Real Property Law Manual No. 1, at 167.

Later in the same article the author points out to his would-be pragmatic readers that "An expert [valuation] witness should, at the very least: Memorize a definition of market value," and goes on to say that such an expert witness should "be familiar with all really comparable sales in the vicinity at or about the time of taking."

These two points raised by the article's author certainly touch upon the crux of the issue regarding competency of expert valuation testimony which must be dealt with by the trial court in the event of a retrial in the instant case.

■ However, we add that while sales not in the same vicinity of the land in question do not necessarily lose their comparability merely because of distance, nevertheless if, because of distance, there is a lack of market, needed facilities, or convenience, or an increase in the cost of transportation, and other related considerations, the sales may have lost their comparability.

■ North Dakota law specifically provides a legislative definition for the term "market value," as used in Chapter 24–01, N.D.C.C., *i. e.*,

"'Market value' shall mean the highest price for which property can be sold in the open market by a willing seller to a willing purchaser, neither acting under compulsion and both exercising reasonable judgment." Section 24–01–01.1(23), N.D.C.C.

See also, *Little v. Burleigh County*, 82 N.W.2d 603 (N.D.1957), at page 608, where the same definition of the term "market value" appears.

The methodology used by valuation experts in arriving at a market value is somewhat more extensive than the definition of "market value" would imply because the data gleaned from comparable recent sales of similar property in the locale, or similar locality, is not the only data which can be used by valuation witnesses in extrapolating a market value for property subject to eminent domain proceedings.

Thus, Mr. Harry Arneson, the expert valuation witness for the landowner in the instant case, who appraised the market value of the landowner's parcels subject to the eminent domain proceeding (excluding the value of the landowner's conditional fee interest in the abutting section line) at approximately $201,000.00, testified that real property appraisers use three approaches in

---

7. Robert Vogel, now an Associate Justice of the North Dakota Supreme Court.

determining market value and that those three methods of appraisal and determination of market value are referred to as the market data (comparable sales) approach; the (replacement) cost approach by value; and, the (property) income approach to value. Arneson testified that he used the third method in arriving at a valuation of the subject property for the reasons that information regarding the income derived by the landowner from the subject property during previous years up until the date of the taking was readily available and that the subject property was unique so that the market data (comparable sales) approach would be unavailing due to a total lack of sufficiently comparable sales.

The State made objection to Mr. Arneson's testimony on the basis that the income approach to value (also referred to as the capitalization of income approach) was an improper methodology from which to extrapolate a market value for the subject properties. The trial judge in overruling the State's objection in this matter *pro tem.* (and, as it turned out, permanently) commended the case of *State v. Nunes*, 233 Or. 547, 379 P.2d 579 (1963), to the litigants as seemingly dispositive of the point.

The State has not cross-appealed in this case, but because the appellant raised an issue on the competency of the State's witness, and because this action is being remanded and a retrial may be in the offing, we find it necessary to comment briefly upon the appropriateness of assessing market value based upon the capitalization of income.

In *State v. Nunes, supra,* the facts are quite similar to the facts in the instant case in that both cases involved the condemnation of land which was being used for the commercial extraction of sand and gravel. In *Nunes,* the Oregon court said:

"[The State] contends that if the capitalization method is to be used at all it can be used only if there is no evidence of sales of comparable property. It is argued that there was such evidence in the

present case. It is not clear from the testimony of the value witnesses whether they were testifying as to the value of comparable land. Apparently the sales referred to were sales of land the price of which was determined on the basis of the value of the land for *farm* purposes. This would not indicate what gravel land would sell for on the market. However, conceding that the sales compared were of lands having value in the market because they contained saleable topsoil and gravel, the price which would be paid for such lands would be determined by the profit which could be derived from the sale of the soil materials taken from the land. We see no reason why the value witness should not be permitted to use the factors which a well informed buyer himself would use in arriving at the price he would pay for the property.

"The capitalization of income when properly employed is an acceptable method of arriving at the value of property. There is no reason why it should not be employed with proper safeguards in the valuation of land, the principal value of which is attributable to income produced from the sale of soil materials. This does not mean that the value of the land can be estimated simply by multiplying the quantity of materials times the existing market price per unit. The appraiser must refine the computation by deducting costs of operation, making allowances for variances in the market price of the materials, calculating the extent of the market for such materials in relation to the amount of materials taken, the possible rise and fall of income, and accounting for other factors which expert appraisers take into consideration in applying the capitalization method."

We concur with this statement of the Oregon court insofar as it is applicable to the instant case.

In *Frederickson v. Hjelle,* 149 N.W.2d 733 (N.D.1967), we had occasion to deal with the issue as to whether an appraiser's evaluation as to the market value of property

subject to eminent domain proceedings, which appraisal was based upon the comparable sales methodology, was admissible in the face of an objection as to its competency. We formulated the pertinent issue in that case as follows:

"The third point asserted by the [Highway] Commissioner is that the [comparable] sales relied upon by Mr. Frederickson [the landowner] and his appraiser . . were not sufficiently comparable in use, location, size, and otherwise to be relevant in determining the market value of the land condemned." 149 N.W.2d 733, at 739.

■ In the *Frederickson* case, we held that it was proper for the trial court to admit evidence of the price paid pursuant to voluntary sales of other property which were somewhat contemporaneous with the date of the action, because the evidence of such sales was a relevant factor which Frederickson's appraiser could properly consider in setting market value; that these other sales were relevant factors to be considered by the appraiser even though they were sales of commercial-zoned property as opposed to the extant agricultural zoning of the subject property; that the question of whether the trial judge erred in admitting testimony as to prior sales over proper objection was a question which resolved itself into whether the trial judge abused his discretion in the matter; and that, in our de novo[8] review of the case (which had been tried to the court), the appraisals of the Highway Commissioner's appraisers were entitled to greater weight, in our view, than those of Frederickson's appraisers, due to the fact that the former were more soundly and thoroughly based.

In *Doll v. Doll*, 162 N.W.2d 691 (N.D. 1968), a divorce case where the value of marital real property was at issue pursuant to the requirement that the trial court effect a just disposition of such property in the action, we reviewed the assertion of one of the parties that the trial court erred in excluding testimony of alleged comparable sales in the area. In holding that it was not error for the trial court to have excluded the testimony of an attorney who had assisted in consummating sales of other land within the area because of a lack of proper foundation therefor,[9] we alluded to *Frederickson v. Hjelle, supra*, when we said:

"[In that] condemnation case, [we] decided that the admissibility of evidence of the price of land in a sale to a party having the power of eminent domain was within the trial court's discretion, and would not be set aside unless it was shown that the trial court had abused its discretion. Applying the general rule, proof of comparable sales is admissible to determine value when a proper foundation has been laid.

"As stated in 32 C.J.S. Evidence § 593(3)c, p. 742:

" 'The degree of similarity required to exist between properties, the nearness in respect of time and distance, and the reception of evidence of sales of other property, generally, are matters which rest largely in the sound discretion of the trial judge.' " 162 N.W.2d 691, at 696.

These principles would have application in the instant case should the situation arise.

It may be of assistance to take note of the Federal Rules of Evidence as adopted by the Congress and signed by the President, which go into effect on July 1, 1975. Even though these rules are not mandatory upon State courts, they nevertheless constitute a reliable guide for State courts, in the

---

8. Pursuant to Section 28–27–32, N.D.C.C., since then repealed.

9. Most notably in *Doll v. Doll* we said: "In (this) case proper foundation was not laid. The admission by the witness . . . that he had not viewed or inspected the property involved either in the land sale transactions or the Doll farm in order to check the quality of the soil and the condition of the buildings failed to sustain Julia Doll's contention that the lands involved were similar or comparable. . . ." 162 N.W.2d 691, at 696.

absence of statutory provisions on the subject matter or rules of evidence declaring otherwise.

## "Article VII.
## "Opinions and Expert Testimony

### "Rule 701.
### "Opinion Testimony by Lay Witnesses

"If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

### "Rule 702.
### "Testimony by Experts

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

### "Rule 703.
### "Bases of Opinion Testimony by Experts

"The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

### "Rule 704.
### "Opinion on Ultimate Issue

"Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

### "Rule 705.
### "Disclosure of Facts or Data Underlying Expert Opinion

"The expert may testify in terms of opinion or inference and give his reasons therefor without prior disclosure of the underlying facts or data, unless the court requires otherwise. The expert may in any event be required to disclose the underlying facts or data on cross-examination."

We recognize a distinction between testimony of an expert witness as to his opinion of the value of the property in question and independent evidence of value on the same property.[10]

 We recognize the rule that the expert witness testifying on value of property does not establish comparable sales as independent evidence but uses them, if he in fact did, to explain his own opinion as to how he reached the value of the property in question. The expert witness need not prove comparable sales as facts but gives them only as the basis for his opinion. The expert witness is not required to establish all the details of the comparable sales he may have used in arriving at his conclusion. However, such matters may be the subject

10. In *Observations on the Trial of Eminent Domain Cases*, reprinted in The Practical Lawyer's Real Property Manual No. 1 (American Law Institute 1974), on page 45, Robert Vogel, now an Associate Justice of the North Dakota Supreme Court, said:

"When experts testify as to comparable sales, the objection is sometimes raised that their testimony is hearsay. Actually it is technically hearsay in the usual case where the expert obtained his information as to sales price and the like from the buyer, or the seller, or from courthouse records. But most courts will allow an expert to testify as to hearsay information

on the theory that he is merely stating the basis for his opinion, and such basis need not be proved by independent evidence. *H & H Supply Co. v. United States*, 194 F.2d 553 (10th Cir. 1952).

"On the other hand, evidence of comparable sales can also be used as independent evidence of value, in which case the hearsay objection might be sustained. Annot., 85 A.L.R.2d 110 (1962); *United States v. Johnson*, 285 F.2d 35 (9th Cir. 1960). *Contra, United States v. Smith* above; *United States v. 3,698.63 Acres of Land,* 416 F.2d 65 (8th Cir. 1969)."

of cross-examination. If the "comparable sale" is in fact only remotely comparable or not comparable at all this goes to the weight of the expert's opinion and not necessarily to the admissibility.

■ Independent evidence by a witness or expert witness as to value in which comparable sales are used as independent evidence and not as a basis for opinion must meet the standard of comparable sales before such evidence is admissible. In this situation the trial court determines whether or not the evidence is competent for consideration by the jury.

In the event of a retrial, the foregoing should constitute an adequate guide, even though we are aware that situations may develop which are not covered herein, in which instance the trial court will exercise sound discretion.

Reversed and remanded for further action consistent with this opinion.

ERICKSTAD, C. J., VOGEL and PAULSON, JJ., and ALFRED A. THOMPSON, Judge, concur.

PEDERSON, J., deeming himself disqualified did not participate; ALFRED A. THOMPSON, Judge of the Fourth Judicial District, sitting in his place.