**MIKE GOLDEN, INC., Plaintiff and Appellee,**

v.

**TENNECO OIL COMPANY, Defendant and Appellant.**

**Civ. No. 890057.**

Supreme Court of North Dakota.

Jan. 18, 1990.

---

Charles L. Donlin (argued), Bismarck, for plaintiff and appellee.

Fleck, Mather, Strutz & Mayer, P.C., Bismarck, for defendant and appellant; argued by Craig C. Smith. Appearance by Brian R. Bjella.

MESCHKE, Justice.

Tenneco Oil Co. appealed from a judgment awarding damages to Mike Golden, Inc. for breach of a reassignment clause in four assignments of oil and gas leases. We reverse and remand for further proceedings.

On July 21, 1980, Golden assigned to Tenneco four oil and gas leases (Bottom Leases) on a 160 acre tract in Bowman County. The Bottom Leases were for a primary term of five years from June 19, 1980, and as long thereafter as oil or gas was produced. The assignments contained reassignment clauses:

> It is further agreed and understood that ninety (90) days prior to the expiration of the primary term of the assigned lease, if there is no well on said land producing oil or gas in paying quantities, and no well *for oil or gas* is being drilled thereon, Assignee shall notify the Assignor at the address hereinbefore designated, and shall immediately and without cost, reassign to said Assignor the oil and gas leasehold estate herein assigned.

Tenneco did not reassign the Bottom Leases to Golden on March 21, 1985, as the reassignment clauses required.

Unaware of the reassignment clauses, Tenneco agreed to sell the Bottom Leases to Koch Exploration Company on April 4, 1985, for $12,800, or $80 per net mineral acre. Koch was considering the formation of a secondary recovery unit known as the Medicine Pole Hills Enhanced Oil Recovery Unit (the Unit), which would include the tract covered by the Bottom Leases. Golden purchased new oil and gas leases (Top Leases) covering the same tract as the Bottom Leases on May 6, 1985, for $12,000, or $75 per net mineral acre. The Top Leases had a primary term of one year to begin June 19, 1985. The Unit did not become effective until after the Bottom Leases expired and the Top Leases began.

Golden sued Tenneco for damages for breaching the reassignment clauses. The trial court granted summary judgment to Golden on the issue of liability and dismissed Tenneco's counterclaim. After trial on damages, the trial court awarded Golden damages of $60,902. On appeal from the judgment, Tenneco argued that the trial court erred (1) in determining that the lost Bottom Leases were to be valued as of

June 19, 1985; (2) in determining that Golden was not required to mitigate its damages; and (3) in determining the amount of damages.

In its decision, the trial court stated: "The fundamental question is the value of [Golden's] leasehold interest on June 19, 1985, the date of the breach of Tenneco's promise to reconvey the bottom leases." Tenneco pointed out that the breach occurred 90 days before expiration of the Bottom Leases, and argued that we should therefore reverse and direct the trial court "to determine the value of [Golden's] leasehold interest on March 21, 1985, and not June 19, 1985." Golden sought damages as of 90 days before expiration of the Bottom Leases. The witnesses testifying about the value of the lost Bottom Leases did so with reference to March 21. The witness whose valuation the trial court adopted made his calculations as of March 20. By itself, the trial court's emphasis on the date that the Bottom Leases expired was clearly inadvertent and harmless.

The trial court recognized that Golden's activities in securing the Top Leases were "to regain his lost position—in effect, a roundabout attempt at a form of mitigation." But, the trial court determined that "the mitigation requirement is not applicable." Tenneco contended that the trial court's determination that mitigation did not apply was erroneous. Artfully conceding that it did not "contest that Golden mitigated his damages in terms of acquiring the top leases," Tenneco contended that the trial court's damage award gave Golden "a significantly greater recovery than that which would have been gained by Tenneco's performance."

One injured by another's wrongful act, whether tort or breach of contract, must make reasonable efforts to minimize the resulting damages. *Fargo Women's Health Organization, Inc. v. FM Women's Help and Caring Connection*, 444 N.W.2d 683 (N.D.1989); *Nicola v. Meisner*, 84 N.W.2d 702 (N.D.1957). NDCC 32–03–36 declares that one may not ordinarily "recover a greater amount in damages for the breach of an obligation than he could have

gained by the full performance thereof on both sides." We are not convinced that the trial court made a mistake in factually determining that, in this case, the doctrine of mitigation of damages did not require a reduction in the amount of damages otherwise recoverable by Golden. Golden's purchase of the Top Leases was a transaction distinct from any rights to the Bottom Leases, leases for a different period of time. We see no reason why Tenneco should benefit from Golden's additional effort and investment in a separate transaction.

Testifying for Golden, Cooper B. Land, a geologist and independent oil and gas operator, valued the lost Bottom Leases by calculating the estimated reserves of oil and gas, or, as he put it, the future earning power of the leased property through production and sale of oil and gas. Tenneco objected to Land's testimony, arguing that "the proper test for measuring damages or determining damages is willing buyer/willing seller," and that "the testimony is not relevant, it's speculative, it's conjectural."

Using technical information from Koch about the proposed Unit, Land calculated that there were "9744 barrels of oil attributable to the leasehold interest." Land fixed the worth of the unproduced oil reserves in the ground at $9 per barrel. Using figures from Koch, Land calculated that "approximately $2.75 for each barrel of oil ... would have to be expended as a capital cost." Land summed up his opinion:

> So I've taken the value of $9 a barrel for the oil in the ground, subtracted $2.75 a barrel for the anticipated capital cost of drilling additional wells and equipping the enhanced oil recovery unit, I've multiplied that by the 9744 barrels of oil attributable to Tract No. 41, and in that way arrived at the value of $60,902.

Land's income evaluation equalled $380 per net mineral acre.

On cross-examination, Land acknowledged (1) that he purchased leasehold interests in the Top Leases from Golden for $100 an acre in July 1985, and (2) that of 15 unit projects within his experience in North

Dakota, "[a]pproximately a third have been totally unsuccessful by anybody's standards" and that "a third have had some measure of success." Land did not know of or consider any provision for additional capital costs for existing wells in the Unit.

Betsy Spomer Maynard, a Tenneco "landman," testified that by April 1, 1985, Tenneco had agreed to sell the Bottom Leases to Koch for $80 per acre. Maynard also testified that the unit operating agreement contained a capital adjustment provision attributing a cash value of 60% of $750,000 to the owners of each of 13 existing wells in the Unit and that:

> we felt we were going to be—you know, we were never going to see payout on the capital adjustment, much less any future expenditures, under Koch's plan of operations. So right upfront we were so far in the red that we didn't see this as a paying proposition for Tenneco.

It is plain that terms and conditions of the proposed Unit affected value.

Lynn Moser, a petroleum "landman" who negotiated leases for Koch in the proposed Unit area, testified that "[w]e took a little over 50 leases for Koch in their Medicine Pole Hills prospect." She testified that, based on her leasing activity in the area at the time, a lease on this tract on March 20, 1985, had a fair market value of $75 per net mineral acre. According to Moser, her opinion of value was consistent with "comparable sale leases" in the same area near the same time.

In its decision, the trial court determined the value of the Bottom Leases lost by failure to reassign: "The Court finds that value to be $60,902. The Court accepts the value, method and computation of Mr. Land." The trial court awarded Golden damages of $60,902.

"[I]t is fairly well-established that the damages in an action for breach of an obligation to reassign are properly measured by the market value of the lease at the time of the breach." J. Colosky, *The Reassignment Provision—The Agony In The Oversight*, 30 Rocky Mt.Min.L.Inst. 5–1, 5–29 (1984). *See also* 2 H. Williams & C. Meyers, *Oil & Gas Law*, § 428.2, p. 474 (1989). "Value reflects something about what people would pay for the article in question and what people would sell it for." D. Dobbs, *Remedies* § 3.2, p. 144 (1973). "By and large in contract cases the standard of valuation considered is market value in contradistinction to any peculiar value the object in question may have had to the owner.... What is sought is the sum of money which a willing buyer would pay to a willing seller." J. Calamari & J. Perillo, *Contracts* § 14–12, p. 607 (3rd ed. 1987). Ordinarily, damages for loss of property must be measured by market value.[1]

■■■ The measure of damages for breach of a reassignment clause is the fair market value of the lease on the date of the breach. *Connell v. Sun Oil Co.*, 42 Colo. App. 311, 596 P.2d 1215 (1979). Market value is "the price a buyer is willing to pay and the seller is willing to accept under circumstances that do not amount to coercion." *Connell v. Sun Exploration & Production Co.*, 655 P.2d 426, 428 (Colo. App.1982). The general evidentiary rules for proof of market value apply in an action for breach of a reassignment obligation. J. Colosky, *The Reassignment Provision—The Agony In The Oversight*, *supra*, at 5–31. Appraisers generally use three approaches to get at fair market value: (1) analysis of comparable sales or market data; (2) analysis of the cost of replacement less depreciation; and (3) an income or economic analysis. *Ulvedal v. Board of County Comm'rs*, 434 N.W.2d 707, 710 n. 3 (N.D.1989); *Minot Sand & Gravel Co. v. Hjelle*, 231 N.W.2d 716 (N.D. 1975). "Obviously, testimony of the sale of similar land in the immediate vicinity, recent in time, is going to be very persuasive as to the market value of the land being taken." R. Vogel, *Observations on the*

---

1. While market value is the usual measure of damages, other measures may apply when, for example, there is no market or market value will not fully compensate. J. Calamari & J. Perillo, *Contracts,* § 14–12 (3rd. ed. 1987); D. Dobbs, *Remedies* § 3.2 (1973). The circumstances in this case do not suggest that any measure other than market value would be appropriate.

*Trial of Eminent Domain Cases,* 16 The Practical Lawyer 40, 45 (Oct. 1970). In this case, evidence of sales of leases in the immediate vicinity at the closest times largely evidenced market value.

Moser testified on behalf of Tenneco, analyzing comparable sales, that on March 20, 1985, the Bottom Leases had a fair market value of $75 per net mineral acre. Land, on behalf of Golden and analyzing expected future income, valued the leases at $60,902, or $380 per net mineral acre. Land only calculated the potential future income without connecting it to market value. Land did not take into account any contingencies or uncertainties which could arise in starting and operating Koch's proposed Unit. Land did not arrive at an opinion as to the fair market value of the Bottom Leases.

■ A property's future income potential does not equal its present fair market value, although expected income may be one factor bearing on fair market value. *See Irgens v. Mobil Oil Corp.,* 442 N.W.2d 223 (N.D.1989). "The productive value of land, or value of the land to its owner based on the income he is able to derive from his use of it, is not the measure of compensation and is not material except so far as it throws light upon the market value." 4 *Nichols on Eminent Domain,* § 12.02[2], pp. 12–82, 12–83 (Rev. 3rd ed. 1989). The trial court erred as a matter of law in accepting "the value, method and computation of Mr. Land." Potential income alone is not market value.

On remand, the trial court must determine the fair market value of the Bottom Leases to a willing buyer and a willing seller, each exercising reasonable judgment and not acting under compulsion, at the time of Tenneco's breach of the reassignment clauses.[2] *See* NDCC 24–01–01.1(23) and *Minot Sand & Gravel Co. v. Hjelle,*

*supra.* We reverse and remand for that determination by the trial court.

ERICKSTAD, C.J., and LEVINE and GIERKE, JJ., concur.

VANDE WALLE, Justice, concurring specially.

I concur in the result reached in the majority opinion and much of the rationale contained therein. I write separately to note that I am uncomfortable with footnote 1 which concludes that "[t]he circumstances in this case do not suggest that any measure other than market value would be appropriate" although recognizing that other measures of damages may apply when market value will not fully compensate. I am not as convinced, as is the majority, that those circumstances are not present in this case.

The failure of Tenneco to recall the reassignment clauses and their responsibility thereunder (the majority characterizes Tenneco as being "unaware" of the reassignment clauses) and the result such a recognition might have had with regard to the unit negotiations in which Tenneco was involved with Koch, wherein Koch was considering the formation of a secondary recovery unit, is unknown. Although the unit did not become effective until after the bottom leases had expired and the top leases began, it appears probable that the negotiations had taken place prior to that time and that the terms of the unit, including the participation factors, were well established by that time.

If there is evidence that Golden would have been in a position to receive a more favorable share of unit production had Tenneco recognized their reassignment responsibilities under the clauses, resulting in Golden being asked to participate in unit negotiations directly, I would not foreclose

---

2. Evidence of comparable sales of other leases in the Unit at the time the Unit was being put together strongly suggested a market value for the Bottom Leases of under $100 per net mineral acre. At the time of Tenneco's breach, the Bottom Leases had only 90 days remaining in the primary term; Golden bought new Top

Leases on the same lands for $75 per net mineral acre on May 6, 1985, with a primary term of an additional one year. As late as July 1985, when formation of the Unit was more certain, Land bought a share of the Top Leases, with the one year longer term, in the same tract for $100 per net mineral acre.

evidence thereof by limiting, at this time, the damages to market value.