**NOKOTA FEEDS, INC., a corporation,
Plaintiff and Appellant,**

v.

**STATE BANK OF LAKOTA, Defendant
and Respondent.**

**Civ. No. 8889.**

Supreme Court of North Dakota.

Aug. 13, 1973.

Duffy & Haugland, Devils Lake, for plaintiff and appellant.

Idean M. Locken, Lakota, for defendant and appellee.

VOGEL, Judge.

The appeal is from a jury verdict in favor of the defendant State Bank of Lakota in an action for a balance due the plaintiff-appellant for turkey feed and supplies

furnished to Floyd D. Eaton, who originally was a codefendant. Eaton confessed judgment at the commencement of the trial, and is not a party to the appeal.

The claim against the bank was based on an alleged guaranty of payment of sums due the plaintiff from Eaton. It is undisputed that the defendant bank agreed to "finance" Eaton in his turkey-raising business, but the parties are in sharp disagreement as to the legal significance of a promise to "finance." As will be seen, the court instructed the jury that the bank would be liable only if it gave an original obligation or promise, and would not be liable if it gave a "collateral promise." A "collateral promise" was defined as one where there is a promise to answer for the obligation of another under circumstances making the promisor liable only in the event of a default by the party having the primary obligation to pay the debt. Such a promise, the court instructed, must be in writing and, since it is undisputed that the promise here was not in writing, the plaintiff could not recover if the promise were collateral. To these instructions the defendant objected and preserved its objection on this appeal, by motion for directed verdict and alternative motion for judgment notwithstanding the verdict or for a new trial. The court also instructed the jury that in determining whether the promise was original or collateral it could consider the surrounding circumstances and the intention of the parties.

We turn first to the evidence before the jury, the sufficiency of which was attacked by the plaintiff.

It is undisputed that Eaton made arrangements with the bank to finance his turkey-raising operation. The bank agreed to advance up to $3.25 for each of not more than 10,000 turkeys in each lot of turkeys to be raised outdoors by Eaton, up to four lots per year, with a maximum loan at any one time of $75,000. At one point during the second year of the agreement Eaton had exceeded his limit of financing

per turkey on one lot, and the bank cut off future financing. At about the same time, the bank discovered that Eaton had not paid the plaintiff, Nokota, for feed it had furnished to Eaton. A meeting was thereupon held between the parties to this appeal and Eaton and it was agreed that the turkeys would remain on the Eaton farm, rather than being repossessed and taken elsewhere, that Nokota would supply the feed required to bring them to maturity, and that the proceeds would be disposed of as agreed. The agreement as to division of the proceeds was put into writing, in the form of a letter dated December 30, 1970, from the vice president of the bank to the plaintiff, Nokota Feeds, Inc., and agreed to in writing by Eaton and his wife. The letter, Exhibit 2, states that Nokota Feeds is advised that the bank has a security interest in all the turkeys in question, and continues:

"Whereas the Nokota Feeds Inc., of Devils Lake, N. Dak., has agreed to finish the feeding out of these turkeys, we the State Bank of Lakota will agree to forward to the Nokota Feeds Inc., and Floyd D. Eaton and Bessie T. Eaton the remittance received from the sale of these turkeys less our Note No. 27948 in the amount of $10,392.33 plus interest on this note from September 15, 1970."

The evidence to support a direct promise of the bank is sparse. Edgar S. Brien, manager of the plaintiff at the time Eaton started his turkey-raising operation, testified that O. K. Anderson, the president of the bank, said that he would "finance this entire operation." He answered "Yes" to a leading question, not objected to, as to whether the president of the bank assured him or promised him that the bank would "see to it" that the feed that Eaton purchased would be paid for. Later, he said that the president stated that the bank would advance Eaton the money, and he didn't know if he used the word "guarantee" but he said the bills would be paid by Mr. Eaton. He admitted that all of the bills were sent directly to Eaton, and the

account was on the books of Nokota Feeds in the name of Eaton alone. He admitted that he had testified earlier, in a deposition, as follows:

"Question: In your talk with Mr. Anderson did he tell you he was going to see that your bills were paid?

"Answer: Yes, he said they were going to finance.

"Question: Finance, but he did not say that he would see that your bills were paid?

"Answer: But you are splitting hairs, aren't you?"

The president and major stockholder of the plaintiff, Arthur Lanz, testified that he demanded payment from the vice president of the bank in February 1971. The vice president answered, rather unresponsively, that the bank would "cut off the money and they were through, words to that effect."

He also testified that he once asked the senior Mr. Anderson, the president of the bank, whether he would guarantee payment of Eaton's bills and "in my book he did" guarantee payment. The conversation was, he said, "Can I be sure of this money? How firm is this deal?" and the response was, "You don't have to worry." However, he also admitted stating, in a deposition prior to trial, that nobody had ever told him that the bank would see that Eaton's bills were paid, and that Anderson did not tell him at any time that he would guarantee payment of any supplies or merchandise purchased at Nokota Feeds.

Both of the bankers, the senior Anderson, who was president, and the younger Anderson, who was vice president, admit agreeing to "finance" Eaton, but deny promising to pay any particular bills directly through the bank. Their commitment, they say, was to lend money to Eaton pursuant to their agreement with him. They point out that they paid no bills directly, were not billed by Nokota, and spec-

ified no requirements as to the source of feed to be purchased by Eaton.

It is apparent from the foregoing that there was a question of fact for the jury as to the nature of the agreement by the bank to finance Eaton.

■ Even if we were not required to view the evidence most favorably to the successful party, we believe the greater weight of the evidence favors the bank. At best, the plaintiff's contention that the bank promised that it "would see to it" that the feed would be paid for and that the bills "would be paid" is language indicating a collateral promise, not a direct promise to pay. Gidley v. Glass, 41 N.D. 542, 171 N.W. 93 (1919); City of Highland Park v. Grant-Mackenzie Co., 366 Mich. 430, 115 N.W.2d 270 (1962).

■ Further, a promise to "finance" another "means simply to loan it money." Needles v. Kansas City, 371 S.W.2d 300 (Mo.1963).

■ Since the question of the statute of frauds was raised by the pleadings, the court instructed the jury that in the absence of a written agreement, the bank would be liable only if it agreed to be directly liable for the payment of the feed bill, but not if it merely agreed to be liable in case of default by Eaton. The court's instructions were based upon the statutes of this State and prior decisions of this court.

The statutory provisions which the trial judge condensed into his instructions include the following:

"9–06–04 [N.D.C.C.]. *Contracts invalid unless in writing—Statute of frauds.* —The following contracts are invalid, unless the same or some note or memorandum thereof is in writing and subscribed by the party to be charged, or by his agent:

.    .    .    .    .    .

"2. A special promise to answer for the debt, default, or miscarriage of an-

other, except in the cases provided for in section 22–01–05;

.   .   .   .   .   .

"22–01–04 [N.D.C.C.]. *Guaranty to be in writing—Exception—Consideration need not be expressed.*—Except when a guaranty is deemed an original obligation as provided in section 22–01–05, a guaranty must be in writing and signed by the guarantor, but the writing need not express a consideration."

"22–01–05 [N.D.C.C.]. *When a guaranty need not be in writing.*—A promise to answer for the obligation of another in any of the following cases is deemed an original obligation of the promisor and need not be in writing:

.   .   .   .   .   .

"3. When the promise, being for an antecedent obligation of another, is made upon the consideration that the party receiving it shall cancel the antecedent obligation and accept the new promise as a substitute therefor, or upon the consideration that the party receiving it shall release the property of another from a levy under an execution on a judgment obtained upon the antecedent obligation, or upon a consideration beneficial to the promisor, whether moving from either party to the antecedent obligation or from another person;"

.   .   .   .   .   .

■ Applying the statutes to the factual situation presented by the evidence, we hold that the instructions fairly state the law applicable.

One further question as to the instructions concerns us. Although both parties were given ample opportunity to read and make objections to the instructions, the only objections made were those mentioned above plus a vague, general objection to all use of the words "collateral promise." Later, when the alternative motion for a judgment notwithstanding the verdict or for a new trial was made, ten days after the trial, the plaintiff alleged as "plain error" the court's instruction that in order to render a verdict for the plaintiff the jury must find, by the greater weight of the evidence, ". . . (3) that such promise would be of benefit to the Bank."

■■ Of course, it is the rule, as counsel recognized by his reference to "plain error," that the appellant will not be allowed to complain of the giving or the failure to give an instruction if, after he has had adequate time to examine and take exceptions, he fails to object. He is then deemed to have waived his objections. Lembke v. Unke, 171 N.W.2d 837 (N.D. 1969); Klokstad v. Ward, 131 N.W.2d 244 (N.D.1964); Rule 51, N.D.R.Civ.P. By referring to "plain error," counsel asked the trial court, and now asks us, to hold that—in spite of plaintiff's failure to comply with the requirements of Rule 51, N. D.R.Civ.P.—the error is so fundamental that a miscarriage of justice may occur. We have often stated that nondirection unless it amounts to misdirection, is not reversible error. Brauer v. James J. Igoe & Sons Construction, Inc., 186 N.W.2d 459 (N.D.1971); Lund v. Knoff, 85 N.W.2d 676, 67 A.L.R.2d 1110 (N.D.1957); Mousel v. Widicker, 69 N.W.2d 783 (N.D.1955).

In this connection, we note that it was the attorney for the appellant who brought out on direct examination that the financial arrangement actually made, whatever its legal import might be, was intended to be of financial benefit to the bank, as shown by this question and answer, on cross-examination of the president of the bank:

"Q. And I take it that on your note or this was a financial arrangement that would prove—hope to prove profitable for the bank?

"A. Well, we were charging interest. We do on all our loans."

We therefore doubt that the jury was at all likely to bring in a verdict in favor of the bank on the ground that it would not

benefit from the transaction. Further, it appears that the instruction is correct. Glock v. Hillestad, N.D., 85 N.W.2d 568; Austford v. Smith, N.D., 196 N.W.2d 413. In both of these cases, the following language appears:

"On the other hand, when the leading object of the promisor is to subserve some interest or purpose of his own, notwithstanding the effect is to pay or discharge the debt of another, his promise is not within the statute."

■ At any rate, we are satisfied that the giving of the instruction objected to is not "plain error."

The appellant alleges that "there is no evidence in the case relative to a collateral promise" or contention by either plaintiff or defendant of a collateral promise to support the instructions to the jury summarized above.

■ As we have indicated, the court attempted to instruct the jury in language as plain as possible. It was required to instruct on the circumstances under which the bank would be liable and under which it would not be liable. In doing so, it chose to use language referring to original, or direct, promises and collateral promises. This is language that is appropriate under the circumstances and has often been used in the past. The mere fact that the words "collateral promise" are not found in the pleadings and were not used by the appellant or its attorney does not preclude the use of the language. Similar language was, in fact, used by the court in denying the motion for a directed verdict at the close of the plaintiff's case, and no question as to terminology was then raised.

■ Appellant claims that the lower court erred in denying plaintiff's motion for a directed verdict, and that the evidence was insufficient to sustain the jury's verdict. The appellant moved for a directed verdict before the case was submitted to the jury and moved for judgment notwith-standing the verdict or for a new trial after the verdict was rendered. Both motions were denied, and the appeal raises the question of the propriety of the ruling in both instances. While we consider these issues together, we recognize that the function of the court as to a motion for a directed verdict or judgment notwithstanding the verdict is different from its function on a motion for new trial. When ruling on a motion for a directed verdict or for judgment notwithstanding the verdict, the court must decide whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, reasonable men could reach but one conclusion as to the verdict, or, otherwise stated, whether the evidence, viewed most favorably to the party against whom the motion is made, and giving that party the benefit of all reasonable inferences from the evidence, compels a result with which no reasonable person might differ. The standard for ruling on a motion for new trial is not quite so strict, since the trial judge, on such a motion, is to decide whether the verdict is contrary to the clear weight of the evidence, and whether, in the exercise of his sound discretion, he thinks the motion should be granted to prevent a miscarriage of justice. Garrison v. United States, 62 F.2d 41 (4th Cir. 1932); Rule 50, N.D.R.Civ.P.; 9 Wright & Miller, Federal Practice and Procedure, Civil 2531.

■ We have, however, considered both allegations together. Viewed by either standard, the evidence, we believe, is sufficient to sustain the verdict, and the court committed no error in denying each of the motions.

■ The bank asserts that since there were no specifications as to the respects in which the evidence is claimed to be insufficient, we are precluded from considering the sufficiency of the evidence, citing Westerso v. City of Williston, 77 N.D. 251, 42 N.W.2d 429 (N.D.1950). However, under the North Dakota Rules of Appellate

Procedure applicable to this appeal by the terms of Rule 11, specifications of error and insufficiency of the evidence no longer need accompany the notice of appeal. They may now be raised in the brief [Rule 28, N.D.R.App.P.]; provided, of course, the issues were raised in the lower court. Braun v. Riskedahl, 150 N.W.2d 577 (N.D.1967).

The judgment is affirmed.

ERICKSTAD, C. J., and TEIGEN, PAULSON and KNUDSON, JJ., concur.