Bret O. DEHN, Plaintiff and Appellee,

v.

OTTER TAIL POWER COMPANY and Ervin Sahr, Defendants and Appellants.

Civ. No. 9275.

Supreme Court of North Dakota.

Feb. 24, 1977.

Tenneson, Serkland, Lundberg & Erickson, Fargo, for plaintiff and appellee; argued by Chester J. Serkland, Fargo. Also present: Ronald H. McLean, Fargo.

Nilles, Hansen, Selbo, Magill & Davies, Fargo, for defendants and appellants; argued by Frank J. Magill, Fargo.

ERICKSTAD, Chief Justice.

We have been presented with seventeen issues for our review in this appeal by defendants Otter Tail Power Company and Ervin Sahr, who were found liable, on a comparative negligence allocation, for 75% of $380,000 damages the plaintiff, Bret Dehn, was found to have suffered from burns over large parts of his body and amputation of his right leg below the knee, stemming from contact with an electrical transmission line owned and operated by Otter Tail. The alleged errors are predicated upon the trial court's denial of Defendants' Motions for Judgment Notwithstanding the Verdict, for a New Trial, and to Amend the Judgment. Many of the issues relate to the sufficiency of the facts to sustain a jury verdict and to various instructions given and not given to the jury.

### FACTS

On July 8, 1974, Harlan Wilkie, the Chief of Police at Lisbon, North Dakota, was called to the scene of an accident approximately nine miles south of Lisbon on North Dakota Highway 32. This is a paved roadway extending in a southerly direction from Lisbon. Arriving at the scene at about 4:30 a. m., he found an automobile on its top near a power pole in the west ditch, the front of the car facing west. The driver of the automobile, Larry Pederson, was standing along the shoulder of the road. Wilkie testified that the power pole was broken less than halfway up, but was not detached at that time, and the wires were 25–30 feet from the ground.

Maynard Vannett, a North Dakota highway patrolman stationed in Lisbon, was notified of the accident at about 4:30 a. m. on July 8. After some preliminary investigation, he arrived at the accident scene at approximately 6:00 a. m. He said that the broken pole was about 65 feet from the roadway, on the other side of a steep ditch, and that the broken pole was separated at that time with the top portion hanging from the wires. He stated that the easternmost wire was then about ten feet in the air, and approximately 25 feet west of the passenger door of the overturned automobile. He testified that he drove to Lisbon and, at approximately 7:00 a. m., asked Ransom County Sheriff Raymond Olson to inform the power company regarding the broken pole.

A deposition of Sheriff Olson was read into evidence, in which Olson stated that he notified Ervin Sahr, a lineman for Otter Tail Power Company, at about 7:00 on the morning of the accident, that "[T]here was a report of a post or pole being broken nine miles south of Lisbon, that two wires was hold'n it up, and that a car had hit it."

There was testimony by Dennis Whitman, who was a Deputy Sheriff in Ransom

County at the time of the accident, that, pursuant to a note left him by Patrolman Vannett, between 8:00 and 8:30 that morning he notified Ervin Sahr of the pole being down and that Sahr told him he already knew about it.

Holger Fog, who lived a few miles from the accident scene, testified that on his way to work about 8:00 that morning, he spotted the overturned car and broken pole. He stated that he stopped his car and went to see if anyone was in the overturned car, and upon finding no one there drove to Lisbon. It was his testimony that the easternmost wire was then six to six and one-half feet above the ground and directly above the front wheels of the automobile. He arrived at his office in Lisbon about 8:25 a. m. and made several phone calls, attempting to locate an Otter Tail employee, before he was able to contact a woman he believed to be the wife of an employee of Otter Tail. He told her to notify the company's office that "[T]here was a car that had broken a pole of Otter Tail's."

Bret Dehn, the plaintiff and appellee in this case, testified that he and Ronald Lebus were driving from Dehn's home in Enderlin to a construction project on which they were working, on the morning that the power pole had been broken. Dehn, who was nineteen years old at the time, was employed in his father's construction business. While traveling south on Highway 32, they saw the accident at about 9:20 a. m. Dehn stated that when they stopped, he saw a parked pickup and an individual, later identified as Donald Anderson, the step-father of Larry Pederson (the driver of the overturned car), walking from the shoulder of the road into the ditch. Lebus testified that he saw Anderson step out of the pickup and run across the road. It was Anderson's testimony that he had been standing beside the car for about five minutes before Lebus and Dehn arrived. Both Lebus and Dehn said that they stopped in order to see if there was anyone in the overturned car who needed help. Apparently Anderson and Lebus were first on the north side of the car while Dehn was south

of it. Anderson and Lebus then walked to the south side of the vehicle. While they were engaged in conversation, they heard a buzz and saw a flash, and then Dehn fell over the car. The men dragged Dehn away from the car a few feet, at which time a second explosion occurred. Neither Anderson nor Lebus claimed to have seen Dehn actually contact the wire, though Lebus said he saw him bend down and look into the car shortly before the electric flash.

Anderson testified that he told the others to stay away from the wire as it was "hot", but both Dehn and Lebus stated that Anderson did not speak to Dehn. Anderson also testified that, after the electric flash, Lebus told him "I don't know why in the world he walked into that line after you warned him it was still hot". Anderson said Lebus also made other statements to that effect. Lebus said he had no recollection of making such statements, and testified that he did not hear Anderson warn Dehn about the wires.

Bret Dehn testified that he is about six feet tall. He said that when he stopped at the accident, the lowest (easternmost) power line was about eight feet in the air. Ronald Lebus estimated that height as six feet. Donald Anderson testified that the wire was approximately five and one-half to six feet high, and that there was no wind that day. Anderson also testified that the wire was humming before the electric flash, but no other witness observed this. Dehn estimated that he was about five feet from the wire at the time he looked into the car, and that the wire was not moving or swaying at that time. He acknowledged, under cross-examination, that he could have walked a few steps toward the wire after looking into the car, but stated that he didn't really remember what happened when he stood up after looking into the car.

Ervin Sahr, an employee of Otter Tail and a defendant in this case, testified that he was informed by Sheriff Olson, at approximately 7:10 a. m. on July 8, 1974, that a car had hit an Otter Tail power pole about nine miles south of Lisbon. Although he could not, at trial, recall being informed by

Olson that the pole had been broken, his acknowledgment of being so informed, given at a deposition, was read into the record. He stated that at 7:10 a. m. he knew there was trouble with a pole carrying over 41,-000 volts. He recalled that Sheriff Olson told him there was no immediate danger, so he did not go to work until 7:55 a. m.

Sahr testified that, at about 8:00 a. m., he asked Ernie Klepetka, an electrical serviceman employed by Otter Tail, to investigate the accident scene. He did not instruct Klepetka to put up a barricade or warning devices. He had such devices in the office, but did not send any out with Klepetka as he did not consider the accident site a "congested area."

Sahr said that he did not go the the accident site immediately after coming to work because he received another service call that morning, regarding a tree branch which had fallen on a 110 volt line in the city of Lisbon. The branch had not broken any wires, but Sahr said he considered the situation "definitely dangerous," though no damage had been done at that time.

Sahr and Mr. Neevel, the lineman accompanying him that morning, finished clearing the 110 volt line and went back to the office, arriving at 9:05 a. m. Sahr testified that, at that time, he called the dispatcher in the Otter Tail office at Fergus Falls, Minnesota, to obtain clearance to de-energize the lines at the accident site. He and Neevel then went downtown for a cup of coffee. While leaving the coffee shop at 9:23 a. m., he noticed a dimming of lights, which was about the time of Bret Dehn's injury. He then went back to the Otter Tail office and again called the dispatcher. He placed this call at 9:32 a. m. While Sahr was on the phone, the dispatcher was informed that proper switching was done, and Sahr was given permission to de-energize the line at the accident site.

Defendants Sahr and Otter Tail Power Company will be collectively referred to as Otter Tail.

Although Otter Tail has asserted seventeen issues, these issues are predicated on the trial court's denial of three separate motions. Not all issues merit individual treatment.

## MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT

Otter Tail ascribes error to the denial of its Motion for Judgment Notwithstanding the Verdict, which motion stated that the evidence shows Dehn's own negligence as the sole and proximate cause of his injuries; and that there is no evidence on the record to support the jury's findings that (1) Dehn's injuries were caused by Otter Tail's negligence, (2) Otter Tail breached its duty toward Dehn, and (3) Dehn's injury was a foreseeable result of any negligence of Otter Tail.

■ The test the court must apply in acting upon a judgment notwithstanding the verdict is stated in *Nokota Feeds, Inc. v. State Bank of Lakota*, 210 N.W.2d 182 (N.D.1973):

"When ruling on a motion for a directed verdict or for judgment notwithstanding the verdict, the court must decide whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, reasonable men could reach but one conclusion as to the verdict, or, otherwise stated, whether the evidence, viewed most favorably to the party against whom the motion is made, and giving that party the benefit of all reasonable inferences from the evidence, compels a result with which no reasonable person might differ." *Id.* at 187.

*Accord, Riebe v. Riebe*, 252 N.W.2d 175 (N.D.1977); *Lovas v. St. Paul Insurance Companies*, 240 N.W.2d 53 (N.D.1976).

■ Otter Tail's arguments relate to the relative negligence of the parties. Negligence and proximate cause, it is well established in this state, are questions of fact for the jury unless reasonable minds can draw but one conclusion therefrom. *Kresel v. Giese*, 231 N.W.2d 780 (N.D.1975); *Waletzko v. Herdegen*, 226 N.W.2d 648 (N.D.1975); *Olson v. Cass County Electric Co-operative, Inc.*, 94 N.W.2d 506 (N.D.1959).

In viewing the record to determine the correctness of the denial of the Motion for Judgment Notwithstanding the Verdict, we will treat as admitted the evidence against Otter Tail, as well as any inferences and conclusions which may reasonably be deduced from such evidence. *Valenta v. Life Insurance Company of North America,* 196 N.W.2d 393 (N.D.1972); *Ternes v. Farmers Union Central Exchange,* 144 N.W.2d 386 (N.D.1966); *Schmitt v. Northern Improvement Company,* 115 N.W.2d 713 (N.D.1962).

■ Applying the above standards, we believe the trial court properly denied the Motion for Judgment Notwithstanding the Verdict. The jury could reasonably have concluded that the conduct of Otter Tail, especially in light of its failure to promptly inspect the accident site and set up warning devices, was the proximate cause of Dehn's injury. The relative dangers involved in the two service calls that morning, and the priority which Otter Tail, through Sahr, gave the tree branch over the damaged pole, was a matter for the jury.

There was evidence that Sahr, and thus Otter Tail, knew at 7:10 a. m. that a car had struck and broken an Otter Tail power pole carrying 41,000 volts. The jury could have inferred that he knew, or should have known, that such a collision might damage the car so that it could not be moved, and that a passerby might inspect the car for passengers and in the process come in contact with the high tension wires.

If, as Otter Tail argues, there was no other evidence but that Dehn walked into the wire, we might agree that that act would be an intervening cause severing the causal connection between Otter Tail's negligent act and the injury. *See Moum v. Maercklein,* 201 N.W.2d 399 (N.D.1972). However, no one saw Dehn walk into the wire. Though he admitted, under heavy cross-examination, that he *could* have walked into the wire, he also stated he has no memory of what happened when he stood up after looking into the car. The varying heights of the line prior to Dehn's arrival and expert testimony regarding its instability were sufficient to allow the jury to find that the line dropped and touched Dehn at the time that he stood up after looking into the car to determine whether there was any injured person in the car who needed help.

## MOTION FOR NEW TRIAL

■ Twelve issues are listed by Otter Tail regarding its claim that the district court erred in denying its Motion for a New Trial. Our standard of a review of a denial of a motion for a new trial gives great deference to the trial court. We will not overturn an order denying such motion unless we deem the denial a manifest abuse of discretion. *Stee v. "L" Monte Industries, Inc.,* 247 N.W.2d 641 (N.D.1976).

■ It is claimed that it was error to instruct the jury that an electric power company is under a duty, in some circumstances, to shut off its current, and in instructing it with regard to the "rescue doctrine". Otter Tail makes no argument against the substance of those instructions, but maintains that there is no evidence to support the application of either instruction. Our reading of the record shows that such evidence does exist.

It was within the jury's discretion to find that the location of the broken pole was in an area making it dangerous to passersby. And, as stated earlier in this opinion, the jury could well have determined that Otter Tail's agents knew or should have known that Pederson's car was still in the ditch and would attract "Good Samaritans". Indeed, the record shows that several others besides Bret Dehn looked into the car to see if anyone was inside. This also lends support to a jury determination that the "rescue doctrine" applied; *i. e.,* that Dehn was justified in risking serious injury to rescue someone he *reasonably thought* might be in the car.

■ Otter Tail, however, quotes the following language from a North Dakota case:

"To justify risking life or serious injury while rescuing another from danger, the peril which is threatened must be imminent and real, and not speculative or

imaginary, and there must be more than a supposition that an accident to some person may follow if the rescue is not performed. [Citation omitted.]" *Wolff v. Light,* 169 N.W.2d 93, 99 (N.D.1969).

In *Wolff,* the defendant struck the front of a cafe with his automobile, breaking a plate glass window. The plaintiff, in attempting to remove a broken piece of glass from the molding, was injured when the glass fell on him.

*Wolff,* however, later says that "A person who takes such steps must show that there was imminent peril, or that a reasonably prudent person, under similar circumstances, would have acted as he did." *Id.* at 99. The test set forth in the latter part of that quotation is the applicable one. *Wolff* was decided on the basis of contributory negligence, which has been abrogated by a comparative negligence standard. Section 9–10–07, N.D.C.C.; *Wentz v. Deseth,* 221 N.W.2d 101 (N.D.1974). The circumstances in *Wolff* also differed from the instant case in that it was apparent in that case that no one was in danger from the falling glass, while Dehn had to approach the automobile and subject himself to possible danger in order to discover if anyone were inside.

Also, because of the comparative negligence doctrine, under which the jury did find Dehn 25% negligent, some negligence by him would not necessarily preclude recovery.

■ Otter Tail claims that the court erred in permitting Dr. William Mazer to testify that the east phase of the transmission line could have dropped on Dehn. The portion of the transcript Otter Tail refers to reads as follows:

"BY MR. SERKLAND:

"Q Dr. Mazer, on this question of the circuit breaker—no, on this question of some movement in these lines, based upon the statement of the successive distances during the early morning hours, and upon Exhibits 1 and 2, and then calling upon your knowledge as an expert, as an electrical engineer, could you testify to the—that a movement of this line

under these conditions could well occur with certainty—with engineering certainty?

"MR. MAGILL: Could you answer that question yes or no, please.

"THE WITNESS: It could occur, yes."

Otter Tail argues that the use of the word *could* renders Dr. Mazer's opinion inadmissible, quoting the following language from *Vaux v. Hamilton,* 103 N.W.2d 291 (N.D.1960):

"The trial court overruled an objection by the defendant to the following question put by the plaintiffs to a medical expert, testifying on behalf of the plaintiffs, as to the future pain and suffering of one of the plaintiffs:

'Doctor, can you state with a reasonable degree of medical certainty that there is a distinct possibility that this might happen?'

An objection that the question was leading, suggestive, speculative, and conjectural was overruled.

"The question in the form in which it was asked was clearly objectionable. While there are exceptions to the general rule that an opinion of a witness may not be received in evidence and although, under certain circumstances, the opinion of an expert is admissible, testimony which consists of no more than a mere guess of the witness is not admissible. Such testimony must be as to a definite probability and must not involve, to an excessive degree, the element of speculation or conjecture. The question directed to the medical expert in this case was calling for a mere guess on the part of the doctor 'that there is a distinct possibility that this might happen.'

"Webster defines 'possibility' as 'the character, state, or fact of being possible, or that which may be conceivable.' Thus, even if an event might occur only once in ten thousand times, it still is within the realm of possibility, though very improbable.

"A medical expert is qualified to express an opinion to a medical certainty, or

based on medical probabilities only, but not an opinion based on mere possibilities. (Citations omitted)" *Id.* at 295.

However, Dr. Mazer did give his opinion in more positive form at several places in the transcript, of which the following exchange is an example:

"BY MR. MAGILL:

"Q Well, I'm going to ask the question again and see if I've got it right.

"Just one or two or three seconds before the contact, as I understand it, you are not able to tell us whether the wire dropped or moved down or any other way, is that correct?

"A I'm able to venture a engineering opinion on that.

"Q A guess; a speculation?

"A No, sir. I'm not here to guess or speculate.

"Q Okay. Give me that engineering opinion.

"A I gave it, and I'd like to have it read back.

"Q Try me *again.*

"MR. SERKLAND: Would you state it again seeing he's asked you.

"THE WITNESS: There is a *high probability* that the wires moved, the whole structure moved, because of the instability of the upper portion of the pole which had been broken away, and because according to the assumptions read to me by Mr. Serkland, there had been a succession of movements for the previous three or four hours." [Emphasis added.]

Any possible error resulting from Dr. Mazer's earlier use of the word *could* was cured by the later, more positive testimony. *Thornburg v. Perleberg,* 158 N.W.2d 188, 192 (N.D.1968).

 It is also argued that since Dr. Mazer's opinion of a high probability that the wire dropped is based on a presumption that it was unstable, which presumption was in turn based on testimony of a succession of previous movements of the wire, the testimony was "incompetent and lacked a proper foundation." This position is without merit. We should point out that, in modern judicial usage, the word incompetent may refer to a witness but not to testimony.

Otter Tail bases this argument upon an Eighth Circuit case, from which it takes the following quote:

"[Plaintiff] had the burden of proving not only that defendant was negligent in the discharge of some duty in connection with the unloading of the tank car, but that such negligence was the proximate cause of plaintiff's injury. . . . While circumstantial evidence is competent to prove negligence or the cause of an injury, the circumstances must be such as to take the case out of the realm of mere conjecture. An inference of negligence must be based on a logical relation and connection between the proven facts or circumstances and the conclusion sought to be adduced from them. The circumstances must themselves be proved and can not be presumed. . . . A presumption must be based upon facts proven by direct evidence and can not be based upon nor inferred from another presumption." *Westland Oil Co. v. Firestone Tire & Rubber Co.,* 143 F.2d 326, 330 (8th Cir. 1944).

A full reading of *Westland* shows that it does not really stand for the proposition that a presumption may not be based upon another presumption. In any event, it is distinguishable from the instant case. In *Westland,* the expert *assumed* that deceased had turned off a light switch in a pump house, an assumption for which there was no evidence in the record. From this it was presumed that a spark flew from the light switch, and it was further presumed that this spark ignited some gasoline. Thus, the expert had no factual foundation upon which to base an opinion. In the instant case there was evidence the broken pole placed great stress upon the wire and evidence of varying heights of the wire prior to the electric flash. This provided a factual foundation for a conclusion that the wire was unstable. From this it could have been inferred by an expert that there was a

high probability that the wire moved closer to the ground. It was for the jury to decide what happened in light of the expert's testimony and for it to weigh the expert's testimony. Once an expert witness is accepted as qualified, a party wishing to discredit his testimony must demonstrate to the jury that his testimony should be disregarded, either by impeachment or through testimony of other experts. Otter Tail apparently attempted to overcome this testimony, but failed in its attempt.

 Otter Tail states that the district court erred in failing to give North Dakota Jury Instruction No. 100 in its entirety. The instruction given is as follows:

"Everyone is under a duty to exercise ordinary care for his own protection and safety, and, in doing so, to make reasonable use of his faculties to avoid injury to himself. If he fails to do so, he is guilty of negligence. His negligence is 'contributory negligence' if it concurs or combines with negligence of the defendants so that the negligence of both is a proximate cause of the injury, although the negligence of the defendants may have been different in degree or in its effect."

The phrase which the court refused to give despite Otter Tail's request that the instruction be given in its entirety, adds "except so far as the injured person willfully or by lack of ordinary care, has brought the injury upon himself." Though Otter Tail claims that the omitted portion reflects the North Dakota comparative negligence statute, Section 9–10–07, N.D.C.C., this court has stated that the contrary is true. In *Wentz v. Deseth,* 221 N.W.2d 101 (N.D. 1974), we pointed out that when our legislature enacted Section 9–10–07, *supra,* it also amended Section 9–10–06, N.D.C.C. We then went on to say:

"By the 1973 legislation, Section 9–10–06, N.D.C.C., was amended and re-enacted by omitting therefrom the exception reading 'except so far as the latter, willfully or by want of ordinary care, has brought the injury upon himself.' This is the language upon which assumption of risk was based. [Citation omitted.] Now that this

language has been deleted from the statute, the affirmative defenses of assumption of risk and contributory negligence no longer are the law of North Dakota, and negligence cases now are governed by the doctrine of comparative negligence." *Id.* at 104–105.

We conclude, therefore, that it was proper for the trial court to decline to use that language.

 Otter Tail further asserts the trial court erred in refusing to submit their requested instruction on the doctrine of intervening cause:

"The defendants are not liable to the plaintiff where the injury of which the plaintiff complains occurred through some independent or unrelated and efficient cause, as by the intervening efficient act of a third person. An efficient act causing the injuries complained of is an act or omission which directly brings about the results complained of, and in the absence of which the happening complained of would not have occurred."

According to the record, the instructions which were given include the following:

"Before a person can be held responsible for negligence either as the basis of a claim of liability or as the basis of the defense of contributory negligence, his negligence must have been a proximate cause of the injury.

\* \* \* \* \* \*

"If the negligence complained of created a condition which thereafter was acted upon by a subsequent, independent, and unforeseeable act which produces an injury, the original negligence is a remote and not a proximate cause of the injury, even if the injury would not have occurred without it."

Viewing both the requested instruction and instructions that were given, we conclude that requested instruction was given in substance, and thus find no error. *Sendelbach v. Grad,* 246 N.W.2d 496 (N.D.1976); *Jore v. Saturday Night Club, Inc.,* 227 N.W.2d 889 (N.D.1975). As the issue of intervening cause was properly before the

jury and the evidence was conflicting, we will not disturb its finding.

Otter Tail's next contention is that the trial court erred in permitting counsel for Dehn to inquire of prospective jurors whether they were willing to return a large verdict. In making this argument, they rely upon *Trautman v. New Rockford-Fessenden Co-op Transport Ass'n*, 181 N.W.2d 754, 759 (N.D.1970). In that case the alleged error was in *refusing* to allow voir dire examination of prospective jurors as to whether they could return a verdict for $293,000. We noted that the scope of voir dire examination is governed by a wise and liberal discretion of the trial court and held that the refusal to allow the examination in question was within the court's discretion. We then went on to say that questions of the jury as to a possible dollar amount of any verdict are inappropriate as tending to influence the jury as to verdict size and "lead[ing] to the impaneling of a jury which is predisposed to finding a higher verdict by its tacit promise to return a verdict for the amount specified in the question during the voir dire examination." *Id.* at 759. It was our conclusion that it was a proper exercise of the court's discretion to sustain the objection to this questioning. In order to determine whether the trial court in the instant case was likewise properly acting within its discretion in overruling the objection, we refer to counsel's questioning as it appears in the record:

"MR. SERKLAND: But let's assume that you are in the jury room, this case has been tried and all of you as jurors have discussed this case and come to the conclusion that the Otter Tail Power Company is liable in damages to Bret Dehn for the injuries and disabilities he's suffered. On that assumption, let's assume that the evidence shows that these injuries are very serious and long lasting, and under the instructions of the Court would require that large damages be given, that is, big—large, big amount of money. Now, on these assumptions, would you have any hesitancy in awarding damages that are commensurate, that

is, are measured by the injury even though they are large in dollars?"

Counsel did not refer to a specific dollar amount, thus our concern in *Trautman* that the juror might feel bound by a tacit promise to return a verdict for that amount is not present. As it is quite possible that a prospective juror might have a prejudice against giving a high verdict, even if he believes the facts warrant it, we recognize the desire of plaintiff's counsel to discover such prejudice. It is our view that it was within the court's discretion to allow this examination.

Otter Tail also asserts it was error to permit Dehn's mother to testify as to how much land the family owned, claiming this prejudicially showed the financial condition of a party. As the context of the question was the type of work Dehn was engaged in, and there was no indication given as to the value of the land, we think this again was a matter within the trial court's discretion. We accordingly find no error in this.

Otter Tail claims that another reason it is entitled to a new trial is that the verdict is contrary to the law and to the evidence, is excessive, and appears to have been given under the influence of passion or prejudice.

We have already indicated that there is evidence on the record to support a verdict for Dehn, and we cannot hold as a matter of law that Bret Dehn's own negligence contributed to his injuries to any greater degree than the 25% assigned by the jury. Beyond the bare assertion that the verdict was given under the influence of passion or prejudice, Otter Tail makes no argument on this issue. We find no abuse of discretion by the trial court in refusing to grant a new trial on the basis of passion or prejudice. *Skjonsby v. Ness*, 221 N.W.2d 70 (N.D.1974); *Teegarden v. Dahl*, 138 N.W.2d 668 (N.D.1965).

It is argued by Otter Tail that the district court erred when it allowed Dr. Donald Lamb to testify, by way of reading his deposition into the record, that certain scars on Dehn's body are permanent and

that certain reconstructive surgery is probably necessary. This argument is based upon testimony of Dr. Lamb that he did not examine Dehn except as to his face and neck.

Upon cross-examination conducted at the deposition, which was also read into the record, Dr. Lamb stated that his testimony as to areas other than Dehn's face and neck was based upon the photographs in evidence, and if the photographs were a fair representation of the scarring there was a very strong probability that treatment was necessary. There is no argument that the photographs are not a fair representation of the scarring. In light of substantially similar testimony by two other qualified medical experts who both physically examined Dehn and viewed the photographs at trial, we will not say that there was no foundation for Dr. Lamb's testimony. *See* Rule 703, N.D.R.Ev., which would not apply directly to this case but is identical to Rule 703 of the Federal Rules of Evidence, adopted as a "reliable guide for State courts" in *Minot Sand & Gravel Co. v. Hjelle,* 231 N.W.2d 716, 727–728 (N.D.1975).

Otter Tail next contends that the district court erred in receiving evidence of the Otter Tail Power Company Employee Safety Manual. As Otter Tail makes no argument as to how they were prejudiced by such evidence, we have no basis upon which to consider this issue.

■ On another evidentiary sub-issue, Otter Tail argues that the trial court erred in refusing to allow a witness, Harlan Wilkie, to testify that he was told by Larry Pederson, the driver of the car that struck the pole, that he had been to a beer party a few miles north of Lisbon on the morning of the accident. Their argument is that since Bret Dehn had also been to what was apparently the same party on that morning, this testimony would be useful in impeaching Dehn's testimony that he did not recognize Pederson's car when he saw it in the ditch. Aside from the fact that it is not relevant whether or not Dehn knew whose car it was, any such testimony is hearsay as to which Otter Tail has not asserted any

exception exists, and should not have been admitted.

■ Otter Tail's next assertion is that the court erred in failing to instruct the jury that they could not arrive at a "quotient verdict", and quotes a Montana case which recognizes wisdom in habitually using such instructions. Although such an instruction, if properly explained, would not have been objectionable, as it is also proper to attempt to keep instructions as short as possible, we cannot say it was prejudicial error not to give that instruction. Where there is no assertion that a verdict was reached in an improper manner, we will trust the decision regarding the inclusion of such an instruction to the discretion of the trial court.

■ The last sub-issue on the question of whether the trial court properly denied Otter Tail's Motion for a New Trial is whether the court erred in giving jury instructions titled "statement of plaintiff's claim" and "statement of the defense and issues tendered by the defendant." In support of their position, Otter Tail cites *Reuter v. Olson,* 79 N.D. 834, 59 N.W.2d 830 (1953), in which case the trial court read the complaint and answers, rather than a paraphrased statement as in the instant case. This court stated that what the trial court did is bad practice, but is not reversible error unless it appears that a party to the action is prejudiced thereby. As Otter Tail has not specified any instance of prejudice stemming from the instruction, we will not rule on its propriety.

In viewing the issues presented in Otter Tail's claim that the district court erred in denying its Motion for a New Trial, we can find no manifest abuse of discretion by that court.

MOTION TO AMEND THE JUDGMENT

■ The jury returned a verdict for $30,000 general damages and $350,000 special damages, finding Otter Tail and Sahr 75% negligent and Dehn 25% negligent, and judgment was entered for Dehn against Otter Tail and Sahr for $285,000. As coun-

sel for Dehn called to the jury's attention no more than $30,000 medical expenses, Otter Tail made a Motion to Amend the Judgment to reflect a verdict of $30,000 general damages and $30,000 special damages. Error is alleged in the denial of this motion.

In a Memorandum Opinion by the trial court on this motion, the facts and conclusion were stated as follows:

"During the course of the trial of the above case, the evidence indicated that the plaintiff had incurred approximately $30,000 in special damages and had also suffered extensive personal injuries including, but not limited to, the loss of a leg and severe burns to various parts of the plaintiff's body which would easily justify a jury's determination that the plaintiff had suffered general damages in the amount of $350,000.

"According to the Court's recollection, during final argument the plaintiff's attorney computed the plaintiff's special damages and specifically called to the attention of the jury that the plaintiff's medical expenses and other related expenses totaled $30,000. No mention was made during the course of the final argument that these damages were 'special damages.'

"It is the Court's recollection that during discussions between the Court and the respective attorneys in regard to jury instructions, the Court pointed out to the attorneys that although the verdict form—which had been agreed to by both parties—asked the jury to determine separately 'general damages' and 'special damages', these terms had not been defined in the jury instructions which were going to be submitted to the jury. It is the Court's recollection that attorneys for both sides took the position that it was not necessary to define these terms as the jury would understand what the terms meant without any specific instructions.

"It is the Court's further recollection that the Court suggested that the terms 'general damages' and 'special damages' be deleted and that the jury be required only to bring in one figure for the total amount of damages, it being the opinion of the Court that there was no reason to separate damages into 'general damages' and 'special damages.' It is the Court's recollection that the attorney for the defendants objected to this procedure and requested that the jury bring in the separate figures.

"In any event, the jury thereafter brought in a verdict in the amount of $30,000 for general damages and $350,000 for special damages. The evidence at the trial clearly indicated, and this Court hereby finds, that what the jury intended to do was to determine that the plaintiff had suffered the reverse of these two figures, that is, $30,000 in special damages and $350,000 in general damages.

"After the verdict was returned by the jury and the discrepancy between special and general damages discovered, the attorneys for the respective parties were asked by the Court as to what their position would be relevant to resubmitting the matter to the jury for correction. The attorney for the defendants objected to resubmitting the matter to the jury although the attorney for the plaintiff was agreeable to do so.

"Based upon the foregoing, it is the opinion of the Court that it was clearly the intention of the jury to determine that the plaintiff had suffered $380,000 in damages. The fact that the jury was confused, through no fault of their own, as to the meaning of the terms 'special damages' and 'general damages' should not be allowed to interfere with the verdict. The motion of the defendants is denied."

We have a statute in North Dakota relating to situations such as this:

"When the verdict is announced, if it is informal or insufficient in not covering the issue submitted, it may be corrected by the jury under the advice of the court, or the jurors again may be sent out." § 28–14–24, N.D.C.C.

It would appear that the trial court could easily have applied this statute and avoided

the issue we are now faced with. However, according to the Memorandum Opinion quoted above, the court's offer to resubmit the matter to the jury was objected to by Otter Tail though Dehn was agreeable to it. We consider this objection to be in the nature of a waiver and will not find error in the district court's failure to apply this statute. We also point out that Section 28–14–24 does not necessarily preclude amendment of the verdict in all cases. *See Bormann v. Beckman,* 73 N.D. 720, 19 N.W.2d 455 (1945); *Fletcher v. Nelson,* 6 N.D. 94, 69 N.W. 53 (1896).

As the jury, by acquiescence of the parties, was not instructed as to the distinction between "general" and "special" damages, what the trial court did was not *amendment* of the verdict, but rather *construction* of it. The following criterion as to construction is set forth in 76 Am.Jur.2d *Trial* § 1207 (1976):

"A special verdict should be construed reasonably and fairly, without heed to slight defects and subtle and refined distinctions."

We believe that the trial court gave the verdict the only reasonable construction possible in light of Otter Tail's objection to a resubmission of the case to the jury. We will not order a new trial to redetermine damages.

For the reasons stated in this opinion, the orders denying Otter Tail's Motion for Judgment Notwithstanding the Verdict, Motion for a New Trial, and Motion to Amend the Judgment, are affirmed.

VOGEL, PEDERSON, PAULSON and SAND, JJ., concur.